**UNITED STATES of America**

v.

**William C. NORRIS.**

No. SCr. 93–13.

United States District Court,
N.D. Indiana,
South Bend Division.

May 21, 1993.

Memorandum and Order
on Reconsideration
July 21, 1993.

Ruth M. Hennage, Asst. U.S. Atty., South Bend, IN, for U.S.

Charles A. Asher, South Bend, IN, for William C. Norris.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause comes before the court on defendant William Norris' motions to dismiss the indictment and for a bill of particulars. The dismissal motions requires the court to determine whether the alleged scheme to defraud cable television companies of revenues by selling equipment that allowed customers a vehicle for the covert reception of premium cable programming states offenses under the mail fraud and wire fraud statutes in the absence of an allegation of any actual misrepresentation, and whether equipment that facilitates the descrambling of coaxial cable transmissions violates 47 U.S.C. § 605(e)(4). For the reasons that follow, the court answers the first question affirmatively and answers the second in the negative, and so dismisses Counts 11 through 15 of the indictment.

### I.

Mr. Norris has moved the court to dismiss all fifteen counts of the indictment against him. Before addressing his motion, a brief background regarding the mechanics of the cable television industry, drawn from the parties' briefs, is necessary.

Communications satellites are fundamental to the distribution of television and cable transmissions. Satellite programmers sell their programming at wholesale rates to distributors, including cable companies. A cable company receives these signals at the cable system control center (the "headend"), and processes and retransmits the signals over coaxial cable to subscribers using closed circuit radio frequency transmissions. Satellite programs are also sold directly to private viewers or commercial establishments at retail rates. In 1986, satellite programmers began to scramble or encrypt their signals to protect themselves from the theft of their services. A person receiving the signal would need equipment to descramble or decrypt the signal to make use of the signal.

Cable television service involves the simultaneous receipt and forwarding of a number of broadcast television and satellite signals. A cable television subscriber receives basic cable service, which includes local broadcasts and other programming, for a monthly fee. The subscriber generally is provided a converter box which allows the subscriber to view only those channels for which he pays a monthly fee. The subscriber must pay an additional monthly fee to view premium channels, such as HBO, Showtime, or Cinemax. To prevent the interception of these premium channels, the cable companies transmit premium programming to subscribers in an encrypted form, and furnish the paying subscriber with a descrambler to decode the encrypted transmission. A subscriber who acquires a descrambler from a source other than the cable company can access premium programming without paying the cable company the additional monthly fee.

Here, the government alleges that Mr. Norris purchased cable converter boxes, remote controls, miscellaneous converter box parts, chips (integrated circuits), and modules from a number of sources. Mr. Norris then sold converter boxes and modifying kits containing chips or modules. These modifying kits came with instructions on how to install the chip or module into a converter box to make the box a descrambler.

Mr. Norris and his employees also are alleged to have modified cable converter boxes into descramblers that enabled people to receive premium cable television channels without paying the required fee. According to the indictment, Mr. Norris and his employees broke security tabs to open the converter box, and, after modification of the box, installed new security tabs. Mr. Norris and his employees allegedly also removed bar codes containing the box's serial number and other information identifying the box's origin.

The indictment alleges that Mr. Norris usually shipped orders for descramblers or modifying kits COD by United Parcel Service ("UPS"), but shipped a few orders via the United States mail; payments were mailed to Mr. Norris' residence. Mr. Norris also allegedly conducted transactions by use of a facsimile machine. Mr. Norris is alleged to have advertised the sale of his descramblers in national publications, such as *Nuts and Volts, Radio Electronics,* and *Video Review.*

### A.

In general, the indictment alleges that Mr. Norris:

> knowingly devised a scheme and artifice to defraud cable television companies of subscription fee revenues. The scheme and artifice to defraud included the manufacture, assembly, modification, sale and distribution of cable television descramblers and other devices which assisted cable television customers in the receipt of premium cable programming without the knowledge of the cable television companies.

Counts 1–9 charge Mr. Norris with violating the wire fraud statute, 18 U.S.C. § 1343 [1]; Count 10 charges Mr. Norris with

---

1. 18 U.S.C. § 1343 provides in part:

Whoever, having devised or intending to devise

any scheme or artifice to defraud ... trans-

violating the mail fraud statute, 18 U.S.C. § 1341.[2] Because the mail and wire fraud statutes share the same language in relevant part, the court will apply the same analysis to both sets of offenses. *Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987).

Mr. Norris contends that the indictment improperly charges a "scheme or artifice to defraud" because there is no claim that he "made any false representation of existing fact or any false statement of future performance", or that he "made any false statements to, or even had any privity or contact with, any cable company", or that he "stood in a fiduciary relationship with any cable company". Mr. Norris claims that the use of the mail and wire fraud statutes to make a federal crime out of every dishonest act offends due process.

*United States v. Coyle,* 943 F.2d 424 (4th Cir.1991), a case factually indistinguishable from the present case, rejected the same arguments. Coyle built and sold descramblers that enabled cable television customers to receive additional cable channels without paying the required fee to the cable company. Coyle advertised the descramblers in national publications, received orders for descramblers over the phone, and distributed the descramblers via UPS and the United States mail. Coyle received payment through the United States mail, either directly from his customers or from UPS (which collected the purchase price from customers upon delivery). Coyle was convicted of "knowingly, unlawfully, and willingly de-

vising a scheme to defraud cable companies of money, and using the mails to execute his scheme." 943 F.2d at 425.

On appeal, Coyle argued that to prove a violation of the mail fraud statute, the government had to prove one of the following: (1) an affirmative misrepresentation of existing fact, (2) a false promise as to the future, (3) the failure of a fiduciary to make disclosure, or (4) a failure to make disclosure under an independent statutory duty. The court flatly rejected Coyle's argument:

> The mail fraud statute is not as restrictive as Coyle contends. *Durland v. United States,* 161 U.S. 306, 313 [16 S.Ct. 508, 511, 40 L.Ed. 709] (1896), teaches that "any scheme or artifice to defraud" is to be construed broadly. As the Court recently reiterated, "the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" The mail fraud statute does not by its terms define fraud. It generally leaves to other statutes the specifications of what conduct constitutes a scheme to defraud. Title 47 U.S.C. § 553,[3] which was enacted to protect the revenue of television cable companies from unauthorized reception of their transmissions, is such a statute.

*United States v. Coyle,* 943 F.2d at 427 (citations omitted); *see also United States v. Cherif,* 943 F.2d 692, 696 (7th Cir.1991) (the words "to defraud" in the mail fraud statute have the "common understanding" of "wronging one in his property rights by dis-

mits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 1341 provides in part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or deliv-

ered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

3. The court of appeals of found ample evidence supporting the district court's finding that the defendant assisted in intercepting or receiving cable transmissions without authorization in violation of 47 U.S.C. § 553. *United States v. Coyle,* 943 F.2d at 426.

honest methods or schemes"), *cert. denied,* —— U.S. ——, 112 S.Ct. 1564, 118 L.Ed.2d 211 (1992).

The court found it immaterial that Coyle did not use the mail to make any misrepresentations or false statements to his customers, because the victims of the mail fraud, the cable companies, need not be the recipient of the material that was mailed. 943 F.2d at 427 (citing *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954)). Moreover, it did not matter that Coyle could have been prosecuted under 47 U.S.C. § 553; the discretion to charge the defendant with a violation under that statute vested with the United States Attorney. 943 F.2d at 427.

Coyle also argued, as does Mr. Norris, that construing the mail fraud statute to encompass his conduct would mean that any criminal act that uses the mail constitutes mail fraud. The court rejected Coyle's contention:

> The Supreme Court exposed the fallacy of this argument more than 60 years ago. Conduct must involve fraud to fall within the coverage of the Act. Even though the concept of fraud within the meaning of the mail fraud statute is broader than common law fraud, it is not limitless. It is characterized by "trick, deceit, chicane, or over-reaching ... [and] dishonest methods or schemes. The [United States Supreme] Court has expressly rejected the notion that mail fraud can encompass deprivation of property by such crimes as 'theft by violence ... robbery or burglary.' Coyle's conviction does not open the floodgates of federal criminal jurisdiction.

*United States v. Coyle,* 943 F.2d at 427 (citing *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)).

Attempting to distinguish *Coyle,* Mr. Norris contends that the Fourth Circuit relied upon the defendant's use of other equipment and newsletters advising and assisting his customers in avoiding the detection of the theft of cable services, something Mr. Norris is not alleged to have done. Mr. Norris is correct that the *Coyle* court relied on that evidence in determining that the defendant

had violated a provision of the mail fraud statute. *See* 943 F.2d at 427. However, the court also stated unequivocally that the manufacture and distribution of devices that Coyle intended to enable his customers to receive cable programs without paying for them was an independent violation of the mail fraud statute because it wronged the cable companies in their property rights by dishonest methods or schemes. 943 F.2d at 427.

Like Coyle, Mr. Norris is alleged to have built and sold descramblers that enabled cable television subscribers to receive additional cable channels without paying the required fees to the cable company. Mr. Norris is alleged to have advertised the descramblers in national publications, received orders over the phone, and distributed the descramblers via UPS and the United States mail. Mr. Norris is alleged to have received payment through the United States mail, either directly from his customers or from UPS, which collected the purchase price from customers upon delivery. The scheme and artifice to defraud alleged in Mr. Norris' indictment is indistinguishable from the scheme in *Coyle.* The court finds *United States v. Coyle* persuasive; Counts 1–10 should not be dismissed.

■ Contrary to Mr. Norris' assertions, a charge of mail or wire fraud need not be supported by an underlying false representation or statement. The Seventh Circuit has recognized that a course of conduct not involving any factual misrepresentations or statements can be prosecuted as a "scheme to defraud" under the mail and wire fraud statutes. *United States v. Doherty,* 969 F.2d 425, 429 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992); *United States v. Richman,* 944 F.2d 323, 332 & n. 10 (7th Cir.1991). "[T]he term 'scheme to defraud' describes a broad range of conduct, some which involve false statements or misrepresentations, and others which do not." *United States v. Doherty,* 969 F.2d at 429 (citation omitted).

Mr. Norris cites a number of cases to support his position, but none are factually similar to the instant case. In *United States*

*v. Holzer,* 816 F.2d 304 (7th Cir.), *vacated,* 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987), the court upheld the mail fraud conviction of a judge who solicited loans from counsel of parties who were to appear before him. Although the court found that Holzer had concealed information in violation of his fiduciary obligations, 816 F.2d at 307, the court did not hold that a fiduciary relationship or concealment were essential elements for conviction under the mail fraud statute. Rather, the court stated that "[t]he legal meaning of 'fraud' is not limited to deceit or misrepresentation; it includes overreaching, undue influence, and other forms of misconduct." 816 F.2d at 309.

In *Reynolds v. East Dyer Development Co.,* 882 F.2d 1249 (7th Cir.1989), a civil RICO action, the court found that mere failure to disclose soil boring tests did not constitute a scheme or artifice to defraud; that the defendants did not try to conceal their activities confirmed that there was no mail or wire fraud. Mr. Norris contends that there is no allegation that he tried to conceal his activities; he openly advertised his converter boxes and modifying kits. This reasoning would make concealment an essential element of the offense of mail or wire fraud; but neither *Reynolds* nor any other case that Mr. Norris cites held that concealment was an essential element of mail or wire fraud. Moreover, in *United States v. Coyle,* 943 F.2d 424, the fact that Coyle openly advertised his cable converter boxes in national publications did not prevent his conviction for mail fraud.

Mr. Norris cites *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), in which the court upheld the conviction for mail and wire fraud statutes of a *Wall Street Journal* employee who used confidential information to make and advise on stock trades. He also cites *United States v. Gallant,* 570 F.Supp. 303 (S.D.N.Y.1983), in which the court disagreed with the government's argument that the defendant's failure to disclose certain information converted a copyright violation into a mail and wire fraud violation. Besides being factually distinguishable, neither case established any essential element of mail or wire fraud not alleged against Mr. Norris.

The court agrees with Mr. Norris that not all sharp dealing or unethical conduct is a "scheme or artifice to defraud", and that federal courts should not be in the business of creating common law crimes. *Reynolds v. East Dyer Development Co.,* 882 F.2d at 1252; *United States v. Holzer,* 816 F.2d at 309. However, the elements required to support a conviction under the mail fraud statute are: (1) a scheme to defraud, and (2) use of the mail for purpose of executing, or attempting to execute, the scheme to defraud. *Schmuck v. United States,* 489 U.S. 705, 721, 109 S.Ct. 1443, 1453, 103 L.Ed.2d 734 (1989); *United States v. Richman,* 944 F.2d 323, 332 (7th Cir.1991); *United States v. Biesiadecki,* 933 F.2d 539, 545 (7th Cir.1991).

Based upon *United States v. Coyle,* 943 F.2d 424, the indictment sufficiently alleges that Mr. Norris participated in a scheme to defraud, and that he used the mail or wires to execute the scheme. The defendant's motion to dismiss Counts 1–10 of the indictment must be denied.

## B.

Counts 11–15 charge Mr. Norris with violating 47 U.S.C. § 605(e)(4), which provides in part:

> Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,-000 for each violation, or imprisoned for not more than 5 years for each violation, or both.

The term "satellite cable programming" is defined as "video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers." 47 U.S.C. § 605(d)(1).

Mr. Norris contends that the indictment's problem is self-evident: the purpose and language of § 605(e)(4) reach satellite transmissions primarily intended for the direct receipt by cable operators; the statute does not reach transmissions received by cable customers over coaxial wire. Mr. Norris maintains that the only criminal statute that arguably applies to the sale of converter boxes that descramble coaxial wire transmissions, as opposed to satellite or radio transmissions, is 47 U.S.C. § 553(a), which provides:

(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(2) For the purpose of this section, the term "assist in interpreting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of paragraph (1).

Mr. Norris claims that there is no reported case of prosecuting a person under § 605(e)(4) for the manufacture or distribution of converter boxes that descramble coaxial wire transmissions, as opposed to satellite transmissions.

The plain language of § 553 appears to govern the illegal activity alleged in the indictment.[4] In addition, the legislative history of § 553 supports the proposition that it was intended to reach individuals like Mr. Norris:

The Committee intends the phrase "service offered over a cable system" to limit the applicability of this section to theft of a service from the point at which it is actually being distributed over the cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or

not in connection with, distribution of the service over a cable system.

\* \* \* \* \* \*

[P]aragraph [§ 553](a)(2) is primarily aimed at preventing the manufacture and distribution of so-called "black boxes" and other unauthorized converters which permit reception of cable service without paying for the service.

H.R.Rep. No. 934, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 4655, 4720–21.

Finally, a number of cases support Mr. Norris' assertion that persons manufacturing or distributing cable converter boxes or "black boxes" are subject to civil or criminal penalties under § 553. *See United States v. Coyle,* 943 F.2d 424 (dicta); *United States v. Gardner,* 860 F.2d 1391 (7th Cir.1988), *cert. denied,* 490 U.S. 1023, 109 S.Ct. 1751, 104 L.Ed.2d 187 (1989); *American Cablevision of Queens v. McGinn,* 817 F.Supp. 317 (E.D.N.Y.1993); *United States v. Beale,* 681 F.Supp. 74 (D.Me.1988); *Storer Communications, Inc. v. Mogel,* 625 F.Supp. 1194 (S.D.Fla.1985).

The government maintains that it properly charged Mr. Norris under § 605(e)(4). The government contends that the phrase "satellite cable programming", as defined in § 605(d)(1), includes satellite signals that have been retransmitted by cable operators over coaxial wire. According to the government, "[i]f Congress had intended the prohibition to include only satellite transmissions, the phrase 'for their retransmission to cable subscribers' would not have been included." This argument is plausible, but not convincing. The definition of "satellite cable programming" covers "video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators." That the signals are to be retransmitted does not mean that Congress sought to protect the satellite signal *ad infinitum* without regard to whether it remains a satellite signal or is translated into some other form; Congress merely described in greater detail the type of satellite signal it

---

4. The government maintains that Mr. Norris' alleged conduct *is also a violation of 47 U.S.C.* § 553. *See* Government's Resp., p. 4, n. 1.

Whether Counts 11–15 would suffice as criminal allegations based on § 553 is not an issue before the court.

sought to protect. In addition, § 605(e)(4) makes illegal the manufacture and distribution of equipment used to decrypt the satellite signal received by cable operators. The converter boxes in the instant case were not designed to decrypt satellite signals "primarily intended for the direct receipt by cable operators"; rather, they allegedly were designed to decrypt signals transmitted over coaxial wire.

Moreover, Congress enacted § 553(a) in 1984. *See* Cable Communications Policy Act, Pub.L. No. 98–549, 98 Stat. 2796. Congress amended § 605(e)(4) to include the language "primarily of assistance in the unauthorized decryption of satellite cable programming" in 1988. *See* Pub.L. No. 100–667, 102 Stat. 3960. It would be superfluous for Congress to have intended for § 605(e)(4) to cover the theft of cable services by use of unauthorized converter or "black boxes" when Congress had enacted a law regulating the same subject matter four years prior. *See Hellon & Assoc., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295 (9th Cir.1992) (Congress must be presumed to have knowledge of its former legislation and to have passed new laws in view of the provisions of the legislation already enacted).

Mr. Norris contends that all reported criminal prosecutions under § 605(e)(4) involve the interception of satellite transmissions or satellite programming, not the prosecution of those who manufacture or distribute devices that descramble coaxial wire transmissions.[5] Like Mr. Norris, the court can find no reported prosecutions under § 605(e)(4) involving the manufacture or dis-

tribution of cable converter boxes that descramble coaxial wire transmissions.

The government cites *United States v. Harrell*, 983 F.2d 36 (5th Cir.1993), for the proposition that the manufacture and distribution of descramblers that are primarily of assistance in the unauthorized decryption of cable television signals fits within the plain language of § 605(e)(4). The court disagrees. In *Harrell*, the court affirmed the conviction of a defendant who illegally modified Video–Cipher II systems, which are used to descramble satellite signals, not the retransmission of those signals via coaxial wire.[6] Harrell argued that § 605(e)(4) was vague and prohibited only commercial cable satellite transmissions, not individual television satellite transmissions. 983 F.2d at 39. The court disagreed and held that § 605(e)(4) applied to the transmission of satellite signals directly to the individual. 983 F.2d at 39. To the extent that any language in *Harrell* may be read to include that the surreptitious interception of satellite signals after they have been retransmitted over coaxial wire violates § 605(e)(4), that language would be dicta. The *Harrell* court did not face the question of whether the interception of a satellite signal retransmitted over coaxial cable by the use of converter boxes or "black boxes" violated § 605(e)(4).

■ As an alternative argument, the government contends that Mr. Norris' conduct violated § 605(a), which, if true, would also constitute a violation of § 605(e)(4).[7] Section 605(a) provides in pertinent part:

---

5. *See, e.g., United States v. Davis*, 978 F.2d 415 (8th Cir.1992) (defendant illegally modified and sold VideoCipher II units which allowed user to decrypt or descramble satellite signals); *United States v. Lande*, 968 F.2d 907 (9th Cir.1992) (defendant modified Videocipher descramblers which enabled non-subscribers to receive scrambled satellite television programs without paying subscription fees), *cert. denied*, — U.S. —, 113 S.Ct. 1299, 122 L.Ed.2d 689 (1993); *United States v. Scott*, 783 F.Supp. 280 (N.D.Miss.1992) (indictment alleged that defendants modified VideoCipher II devices which would descramble satellite cable programs to allow the user to receive the programs through a home satellite dish without paying subscription fees), *aff'd*, 986 F.2d 1418 (5th Cir.1993).

6. The Video–Cipher II can, upon modification, descramble or decrypt all satellite cable programs, allowing the user to receive these programs through his home satellite dish without paying any subscription fees. *United States v. Scott*, 783 F.Supp. 280 (N.D.Miss.1992). Cable operators use the Video–Cipher IIC to descramble television signals before retransmittal by wire to their cable subscribers. 783 F.Supp. at 281.

7. 47 U.S.C. § 605(e)(4) provides:
   Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, *or is intended for*

No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communications or having been acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a). The term "radio communication" is defined as:

The transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

47 U.S.C. § 153.

The government contends that cable television signals fit within the definition of "radio communication" because the cable television companies process broadcast and satellite radio signals and retransmit the signals over coaxial cable using closed circuit radio frequencies. Several civil cases appear to hold that the theft of cable services by unauthorized descramblers violates § 605(a). *See Porter County Cable Co., Inc. v. Moyer*, 624 F.Supp. 1 (N.D.Ind.1983) (defendants' actions of selling and making available decoding devices to cable subscribers violates § 605(a)); *Ciminelli v. Cablevision*, 583 F.Supp. 158, 163–64 (E.D.N.Y.1984) (theft of services by unauthorized descramblers at subscriber's home is theft of a radio transmission); *Cox Cable Cleveland Area, Inc. v. King*, 582 F.Supp. 376, 380 (E.D.N.C.1983) (same).

When those cases were decided, however, § 605(a) prohibited the interception of communication by wire or radio, *see Porter County Cable Co. v. Moyer*, 624 F.Supp. at 3; the current version of § 605(a) does not prohibit the interception of communication by wire. Further, those cases were decided before § 553(a) was enacted. Before the passage of § 553, courts stretched the language of § 605 to apply to the advanced technologies of the 1980s. *See Air Capital Cablevision, Inc. v. Starlink Communications, Inc.*, 601 F.Supp. 1568, 1570–71 (D.Kan.1985). There may have been no statute besides § 605(a) that arguably covered the theft of cable services by unauthorized converter boxes.

Finally, Congress enacted what is now § 605(e)(4), which incorporates violations of § 605(a), in the same bill as § 553(a). *See* Cable Communications Policy Act, Pub.L. No. 98–549, 98 Stat. 2796, 2803. To find that Congress intended § 605(e)(4) to cover the same acts of cable theft as § 553(a) would require the court to find that Congress' enactment of § 553(a) was superfluous. Such an interpretation would violate basic canons of statutory interpretation. *See Boise Cascade Corp. v. United States Environmental Protection Agency*, 942 F.2d 1427, 1432 (9th Cir.1991) (under accepted canons of statutory interpretation, court should make every effort not to interpret a provision of a statute in a manner that renders other provisions of the same statute superfluous); *United States v. Caldera–Herrera*, 930 F.2d 409, 411 (5th Cir.1991) (where possible, statutes must be read in harmony with one another so as to give meaning to each provision).

Finally, the pertinent legislative history of § 553 provides:

Existing section 605 of the Communications Act of 1934 includes a prohibition against the unauthorized reception of communication services. Nothing in this section is intended to affect the applicability of existing section 605 to theft of cable service.

\*　　\*　　\*　　\*　　\*　　\*

---

*any other activity prohibited by subsection (a) of this section,* shall be fined not more than $500,000 for each violation, or imprisoned for

not more than 5 years for each violation, or both.

(Emphasis added).

The Committee intends the phrase "service offered over a cable system" to limit the applicability of this section to theft of a service from the point at which it is actually being distributed over the cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.

\*    \*    \*    \*    \*    \*

Hence, paragraph [§ 553](a)(2) is primarily aimed at preventing the manufacture and distribution of so-called "black boxes" and other unauthorized converters which permit reception of cable service without paying for the service.

H.R.Rep. No. 934, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.C.C.A.N. 4655, 4720.

Although slightly inconsistent, the legislative history may be harmonized by an interpretation that Congress intended § 553(a) to apply to the unauthorized theft of cable services, after the signal has been transmitted by a cable operator over coaxial wire, by the use of unauthorized converter boxes at the subscriber's home. This interpretation still would mandate that any interception of satellite signals before their receipt and subsequent transmission by the cable operator be covered under § 605, while giving meaning to the language and Congress' intent in enacting § 553(a).

Counts 11–15 may allege violations of 47 U.S.C. § 553, but do not allege violations of 47 U.S.C. § 605(e)(4); accordingly, Counts 11–15 must be dismissed.

## II.

■ Pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, Mr. Norris seeks an order directing the government to furnish a bill of particulars regarding certain matters in the indictment.

■ It is within the trial court's sound discretion to order a bill of particulars. *United States v. Glecier*, 923 F.2d 496, 501 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *United States v. Serola*, 767 F.2d 364, 370 (7th Cir. 1985). Where the indictment provides sufficient information to inform the defendant of the nature of the charges against him, and the government provides the defendant with information about the alleged acts prior to trial, the defendant has not suffered prejudice from the denial of a request for a bill of particulars. *United States v. Glecier*, 923 F.2d at 502; *United States v. McAnderson*, 914 F.2d 934, 946 (7th Cir.1990); *United States v. Andrus*, 775 F.2d 825, 843 (7th Cir.1985).

■ Although the defendant's constitutional rights under the Fifth and Sixth Amendments require that he be informed of the nature of the charges against him to allow him to prepare a defense and protect his right against double jeopardy, they do not require the government to reveal the details of how it intends to prove its case. *United States v. Glecier*, 923 F.2d at 502; *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). The standard is whether the government's indictment sufficiently apprises the defendant of the charges to enable him to prepare for trial. *United States v. Canino*, 949 F.2d 928, 949 (7th Cir.1991); *cert. denied*, —— U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992); *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). An indictment satisfies this standard by setting forth the elements of the offense charged, the time and place of the defendant's conduct which violated that offense, and citation to the statutes allegedly violated. *United States v. Roya*, 574 F.2d 386, 391 (7th Cir.), *cert. denied*, 439 U.S. 857, 99 S.Ct. 172, 58 L.Ed.2d 165 (1978).

Mr. Norris first seeks a bill of particulars identifying the "acts of the defendant that the Government contends constitute violations of 18 U.S.C. §§ 1341 and 1343 and 47 U.S.C. § 605(e)(4)." The indictment describes in general the alleged scheme to defraud cable companies of their subscription

fee revenues. Moreover, for Counts 1–10, the indictment specifies the date of the act, the location of the act, the means of communication employed, the destination of the transaction, the type of information communicated, and the statute allegedly violated. As the indictment sets forth the elements of the offense charged, the time and place of the defendant's conduct which violated that offense, and citation to the statutes allegedly violated, *United States v. Roya,* 574 F.2d at 391, the government's indictment sufficiently apprises the defendant of the charges to enable him to prepare for trial. *United States v. Canino,* 949 F.2d at 949; *United States v. Kendall,* 665 F.2d at 134.

Second, Mr. Norris seeks a bill of particulars informing him of exactly what he did to any equipment that distinguished the equipment from other lawful equipment. The court agrees with the government that the indictment, particularly paragraphs 8(b) and 8(c), sufficiently describes what Mr. Norris allegedly did to the converter boxes to render the boxes capable of decoding decrypted cable signals. *See United States v. Kendall,* 665 F.2d at 135 (the defendant is entitled to know the theory of the government's case, not all the evidence the government intends to produce). ·

Third, Mr. Norris seeks a bill of particulars describing the "fraudulent representations that the Government contends Mr. Norris made as part of his alleged scheme or artifice to defraud." Mr. Norris was indicted for devising a scheme to defraud cable television companies of subscription fee revenues. Mr. Norris has not demonstrated how any information regarding fraudulent representations is required to prove the elements [8] of the offense charged, how the information is necessary to his defense, or how he would be prejudiced by not receiving the requested information. *See United States v. Maneti,* 781 F.Supp. 169, 186 (W.D.N.Y.1991) (burden is on defendant to show that nondisclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights); *United States v. Swiatek,* 632

8. The elements required to support a conviction under the mail fraud statute are: (1) a scheme to defraud, and (2) use of the mail for purpose of executing, or attempting to execute, the scheme

F.Supp. 985, 987–988 (N.D.Ill.1986) (defendants' failure to identify any prejudice they would suffer if the bill is denied is, in itself, a basis for denying the motion).

Finally, Mr. Norris seeks information regarding whether the government will rely "upon any theory of aiding and abetting, or any other theory of inchoate liability." If so, Mr. Norris seeks information as to the nature of that theory, as well as the government's allegations supporting such theory. Again, the indictment is clear as to the statutes that were allegedly violated, and Mr. Norris' alleged role in such violations. The indictment carries no citation to 18 U.S.C. § 2, the aiding and abetting statute; submission of such a theory to the jury would appear to amount to a constructive amendment of the indictment. The government is not required to inform the defendant how it will prove its case. *United States v. Kendall,* 665 F.2d at 135.

Accordingly, the defendant's motion for a bill of particulars must be denied.

### III.

In sum, the court:

(1) GRANTS IN PART AND DENIES IN PART the defendant's motion to dismiss the indictment. The court DENIES the defendant's motion to dismiss Counts 1–10; the court GRANTS the defendant's motion to dismiss Counts 11–15; and

(2) DENIES the defendant's motion for a bill of particulars.

SO ORDERED.

### MEMORANDUM AND ORDER ON RECONSIDERATION

The government moves the court to reconsider its May 21, decision dismissing Counts 11–15 of the indictment against defendant William C. Norris. For the reasons that follow, the court concludes that the government's motion must be denied.

to defraud. *Schmuck v. United States,* 489 U.S. 705, 721, 109 S.Ct. 1443, 1453, 103 L.Ed.2d 734 (1989); *United States v. Richman,* 944 F.2d 323, 332 (7th Cir.1991).

The court assumes familiarity with the facts and its prior opinion. The indictment basically alleges that Mr. Norris modified cable television converter boxes such that the boxes could receive premium cable programming transmitted over coaxial wire without paying the cable company a subscription fee. Mr. Norris allegedly distributed these modified converter boxes—"black boxes"—in bulk and to individual customers. Counts 11–15 alleged that Mr. Norris' actions violated 47 U.S.C. § 605(e)(4). In its May 21 opinion, the court held that Mr. Norris' alleged conduct may have violated 47 U.S.C. § 553, but it did not violate § 605(e)(4). The government contends that the court's prior opinion was in error, and that Mr. Norris' alleged conduct violated both statutes, because the statutes are overlapping.

When the court issued its May 21 decision, no reported cases addressed the interrelationship of §§ 553 and 605(e)(4) with respect to the use of black boxes for the unauthorized interception of premium cable programming transmitted over coaxial wire. Since then, the United States Court of Appeals for the Second Circuit has addressed the issue, although in a civil context.

In *International Cablevision, Inc. v. Sykes*, 997 F.2d 998 (2nd Cir.1993), a cable television system brought a civil action against a defendant who was selling cable television "black boxes"—devices that would permit subscribers to receive programs broadcast on premium channels without paying the plaintiff company for the services. The court held that the defendant's conduct violated § 553(a), *id.* at 1004–05, but questioned whether there was a violation of § 605(e)(4). *Id.* at 1007.

The Second Circuit's opinion parallels this court's prior opinion with respect to the interrelationship between § 553 and § 605(e)(4). As did this court, the Second Circuit examined at length the legislative history of the two sections' interrelationship. The Second Circuit noted that the House Report stated: "Nothing in [proposed § 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies available under existing law for theft of service." *Id.* at 1008; *see*

*also* H.R.Rep. No. 934, 98th Cong., 2d Sess. 83 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4720. The court continued:

> The House Report proceeded, however, to describe the section that would eventually become § 553 as "set[ting] forth a liability provision specifically applicable to theft of services offered over a cable system," H.R.Rep. 934, at 83, reprinted in 1984 USCCAN at 4720, and explained that
>
> [t]he Committee intends the phrase "service offered over a cable system" to limit the applicability of this section to theft of a service from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system. *Id.*

*International Cablevision, Inc. v. Sykes*, 997 F.2d at 1008. The court stated that "[t]his statement suggests an intent that § 605 was to govern theft of cable services not from the cable system's wiring but from an air-borne transmission prior to the wire transmission." *Id.* at 1008. No part of § 605 mentions decryption of signals transmitted by coaxial cable. *Id.*

Most importantly, the *International Cablevision* court determined that "it may be that Congress intended that to the extent that a device is sold to assist in the theft of signals directly from a satellite, § 605(e)(4) would apply; that if the theft is of signals transmitted by radio waves, § 605(a) would apply; and that when the theft is of a signal transmitted by coaxial cable, § 553(a)(1), and not § 605, would apply. If this was Congress' intended scheme, it is hardly clear that [the defendant's] conduct violated § 605." *Id.* It appeared to the Second Circuit that the defendant's black box was designed only for intercepting coaxial wire transmissions, not for intercepting satellite or radio signals before their conversion to a form suitable for transmission over coaxial cable. *Id.* Because the applicability of § 605(e)(4) was not

addressed in the district court, the court of appeals remanded the case.

Secondary sources further buttress the Second Circuit's and this court's interpretation of the interrelationship between §§ 553 and 605(e)(4):

> Because cable services often do not originate in the cable operators' studios but, instead, are "piped in" to the cable system headend by other means of transmission, such as microwave or satellites, the [Cable] Act [of 1984] and its legislative history are careful to demarcate where along these transmission paths a theft can occur that results in a violation of this section [§ 553]. For purposes of this section, Congress intended "the phrase 'service offered over a cable system' to limit the applicability of this section to theft of a service from the point at which it is actually being distributed over a cable system," which essentially means from the cable system headend to the subscriber.

Robert F. Copple, *Cable Television and the Allocation of Regulatory Power: A Study of Governmental Demarcation and Roles*, 44 Fed.Comm.L.J. 1, 165–66 (1991).

Notwithstanding the government's argument regarding the legislative history of § 605, as well as the government's argument that the two sections overlap, the court remains steadfast in its opinion that § 553(a), and not § 605(e)(4), governs the theft of a signal transmitted over coaxial cable. *International Cablevision, Inc. v. Sykes*, 997 F.2d at 1009. The government also contends that it will be limited in the manner in which it can charge the defendant if it is restricted to § 553, and that the penalties under § 553 are less severe than those under § 605(e)(4). Any restriction placed upon the government's power to charge a defendant, as well as the applicable penalty, are based upon the court's understanding of Congressional intent in enacting § 553, as illuminated in the statute's words and the legislative history.

The government also contends that if § 553 is the only section that applies to the theft of cable services over coaxial wire, then the prosecution of persons whose conduct did not involve the "manufacture" or "distribution" of such devices would be restricted.[1] The government hypothesizes that one who "modifies" or "imports" such devices would not be covered by the statute. Congress may have believed that even if a person modified or imported a "black box", no harm would fall upon the cable company unless that person then used the box to intercept a communication offered over the cable system, or distributed the box to others for such use. Congress may have believed that the mere modification or importation of a converter box, without use or distribution, does not harm the cable company. In any event, this issue is not squarely before the court at this time, so the court need not speculate as to whether § 553(a) reaches one who "modifies" or "imports" black boxes.

The government contends that a number of cases have held that § 605 applies to Mr. Norris' conduct. To the extent that those cases actually discussed the interrelationship between §§ 553 and 605(e)(4), and to the extent that those cases are on point, the court respectfully disagrees with their conclusion. The court agrees with the Second Circuit's analysis of the interrelationship between §§ 553 and 605(e)(4): "[W]hen the theft is of a signal transmitted by coaxial cable, § 553(a)(1), and not § 605, would apply." *International Cablevision, Inc. v. Sykes*, 997 F.2d at 1009.

Accordingly, the government's motion to reconsider must be, and is hereby, DENIED.

SO ORDERED.

---

1. Section 553(a)(2) provides:

    For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).